# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BILLINGS DIVISION

| | |
|---|---|
| BRETT QUALTERS, | CV 14-40-BLG-SPW-CSO |
| Plaintiff, | |
| vs. | **FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE** |
| CABLEVISION SYSTEMS CORPORATION, d/b/a BRESNAN BROADBAND OF MONTANA, LLC, BRESNAN COMMUNICATIONS, LLC, and OPTIMUM, | |
| Defendant. | |

Plaintiff Brett Qualters ("Qualters") filed this wrongful discharge action against Defendant Bresnan ("Bresnan"),[1] claiming that Bresnan discharged him from his employment as a telephone customer support representative without good cause and in violation of its own written personnel policy. *Second Am. Cmplt. (ECF 6) at ¶¶ 11, 12.*

---

[1]The named Defendant is Cablevision Systems Corporation, d/b/a Bresnan Broadband of Montana, LLC, Bresnan Communications, LLC, and Optimum. According to Defendant's counsel, in 2013 Charter Communications, Inc., acquired Bresnan Communications, LLC, from Cablevision Systems Corporation, and Bresnan Communications, LLC, was Qualter's employer at all times relevant in this action. *Answer to Second Am. Cmplt (ECF 7) at 1, n.1.* Because the parties refer to Defendant as "Bresnan," the Court will do the same.

Pending is Bresnan's summary judgment motion. *Bresnan's Summary Judgment Mtn. (ECF 26).* As discussed further below, Bresnan argues that it had good cause to discharge Qualters for misconduct and various performance deficiencies. *Bresnan's Opening Br. (ECF 28) at 2.* Bresnan argues that it did not violate its policies and procedures in firing Qualters. *Id. at 12-14.*

Qualters responds that summary judgment is not appropriate. He maintains that genuine issues of material fact exist respecting each performance deficiency identified by Bresnan. *Qualters' Resp. Br. (ECF 35) at 2, 6-12.* Qualters acknowledges that he received a written warning respecting certain alleged performance deficiencies, but he disputes Bresnan's characterization of his alleged performance deficiencies. He also contends that he had recently had medical issues that required him to seek certain accommodations from Bresnan and his discharge occurred the day before he would have become eligible for the Family Medical Leave Act, suggesting that Bresnan's proffered reason for discharging him was pretextual. *Id. at 6-13.*

Having considered the parties' submissions and the applicable law, the Court enters the following Findings and Recommendation

concluding that genuine issues of material fact exist and recommending that Bresnan's summary judgment motion be denied.

## I.  **BACKGROUND**[2]

Qualters worked for Bresnan from February 18, 2011, until February 17, 2012.  *ECF 34 at ¶* 1.  He worked as a technical support representative[3] who was to provide professional support for Bresnan customers within customer service standards.  *Id. at ¶ 2.*  His duties included complying with call center operational objectives, phone system procedures, and work schedules.  *Id.*  He also was to work within department/call center/company standards, rules, procedures, policies, and regulations.  *Id.*

In November 2011, Qualters received a "final written warning" discussing various violations of Bresnan policies revealed during an audit of Qualters' calls.  *Id. at ¶ 3.*  The written warning states:[4]

---

[2]The Court has taken the background facts from Bresnan's Statement of Undisputed Facts (*ECF 27*), Qualters' Statement of Disputed Facts (*ECF 34*), and from the supporting exhibits filed with each.  Unless otherwise noted, the facts are undisputed.

[3]The parties sometimes refer to such employees as "agents" and use the titles "representative" and "agent" interchangeably.  Thus, the Court also sometimes uses the titles interchangeably.

[4]Because the parties' dispute in this action centers, in large part, on each party's characterization of information described in the written

**List work rules, company policies/procedures etc. violated**:

Bresnan Communications Employee Handbook, Expectations, Pg. 9:

- That you will perform your work in a careful, efficient manner

- That you will apply yourself to the best of your ability to your assignments

Bresnan Communications Employee Handbook, Pg 19:

- Misbehavior including but not limited to: Wasting time

**Factual and specific description of the performance or behavioral problem(s)**:

Brett, a review of your call handling for the month of October revealed that on a daily basis multiple customer calls were routed to your phone extension, and were then agent disconnected within a few seconds of you receiving the calls. Below is a detailed evaluation of 1 day (October 21[, 2011]), but is representative of all days looked at for the month of October:

Total inbound calls:                                              43
Total inbound calls less than 10 Seconds:                         16
Total inbound calls agent disconnected:                           18
Total inbound calls agent disconnected less than 10 seconds: 13

This represents 13 calls on this day that were delivered to your phone by the system, and were disconnected at your local phone within the first 10 seconds of the call.

It was also discovered that throughout the day you will make outside line calls to your own personal cell phone and then after the call is connected you will transfer the call to the customer survey.

_____

warning, the Court sets forth its material contents verbatim. *See ECF 27-3 at 1-2.*

Throughout the month of October you have been recorded calling your work voicemail box and then hanging up the call immediately after connecting to the mailbox. This was done 5 times on October 21.

During our investigation you reported that you suspected your headset may be bad, and that you "occasionally" get calls that just beep and go away. You said you suspect it was a bad headset. When asked if you had reported this problem you said you had over a month ago to a lead agent, but never to a supervisor, and to no one else since. When asked to clarify you stated that "occasionally" means a couple times a day.

. . .

**Identify the specific action/desired behavior the employee must undertake to improve performance including timeframes. Document dates for follow-up meetings**.

Brett, Disconnecting a customer call is never acceptable. You are responsible to ensure no further agent disconnected calls occur from your phone. If you have a call you feel needs to be disconnected for any reason, you must engage a supervisor or lead prior to the call being terminated for review and documentation.

You must immediately stop making any and all non customer related outbound calls. Calling your personal cell phone, your work voicemail, or any other non customer call related phone number from your work phone is not allowed. This constitutes wasting company time, and a deliberate attempt to falsely achieve performance expectations.

Anytime you are experiencing phone or other hardware problems, it is your responsibility to immediately report those issues to a supervisor or manager, especially when such issues may have a direct negative customer impact. Having a problem with your phone headset that you thought might be disconnecting customer calls and not properly reporting it is

not acceptable behavior, and must be corrected immediately.

**Detail consequences if improvement is not made and
sustained**.

> Your job is in jeopardy. Any further instances of agent
> disconnected calls, inappropriate outbound calls, wasting
> company time, or failure to properly report hardware issues
> impacting the customer experience will result in termination of
> your employment. Continued violations of any other company
> work standards, policies and/or procedures, including
> attendance policies, may lead to future disciplinary action up to
> and including termination.

*ECF 27-3 at 1-2.*

Qualters also was supposed to transfer callers into a survey that
Bresnan used to try to get customer feedback on the level of service it
provides. *ECF 28 at 8; ECF 34 at ¶ 23.* Qualters was required to show
that a certain percentage of callers were transferred to a survey daily
and he understood that Bresnan wanted the caller to complete the
survey. *ECF 34 at ¶¶ 26-27.*

Qualters agrees that he received the final written warning, that it
contains the language set forth above, and that he met with his
supervisor, Cody McNiven ("McNiven"), and the manager of Bresnan's
customer call center, Brek Nielsen ("Nielsen"), to go over the contents
of the warning. He also agrees that, at the time they met, McNiven

may have shown him a list of calls from his phone. *ECF 34 at pp. 2-5, 7-9.* As discussed below, however, Qualters disputes the underlying bases for the deficiencies listed in the final written warning. *ECF 35 at pp. 6-10; ECF 34 at pp. 3-11.*

Around the end of December 2011, Qualters experienced a medical condition and requested an accommodation of some medical leave for doctor appointments. Bresnan's human resource manager for the call center approved the request for accommodation on January 12, 2012. *ECF 33 at ¶ 18; ECF 33-3 at 1.*

Nielsen conducted an audit of Qualters' calls on January 28, 2012. *Id. at ¶¶ 40-41.* Qualters then met with McNiven and Don Unruh, another Bresnan supervisor. *ECF 34 at ¶ 32.* Qualters was informed that, since receiving the final written warning, he had violated other Bresnan policies. One alleged violation was that Qualters instructed a customer to disconnect his cable so that the customer would receive service before other customers. *Id. at ¶ 33.* Another alleged violation was that Qualters told a customer whose internet was not working about an internet outage in Colorado and that there had been some up and down with the internet that day. *Id. at ¶ 42.*

On February 17, 2012, Bresnan discharged Qualters. *ECF 34 at ¶ 76.*

## II. <u>SUMMARY JUDGMENT STANDARD</u>

Fed. R. Civ. P. 56(a) requires the court to grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The movant bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. A moving party without the ultimate burden of persuasion at trial has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment. *Nissan Fire & Marine Ins. Co. v. Fritz*

*Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  If the moving party meets its initial burden, the burden then shifts to the opposing party to establish a genuine issue as to any material fact.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.  *Id.* at 587 (quotation omitted).  In resolving a summary judgment motion, the evidence of the opposing party is to be believed, *Anderson*, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the Court must be drawn in favor of the opposing party, *Matsushita*, 475 U.S. at 587 (citation omitted).

## III.  DISCUSSION

Montana's Montana's Wrongful Discharge from Employment Act ("WDEA"), MCA §§ 39-2-901, et seq., provides, in relevant part, that a discharge is wrongful only if:

. . .

(b)    the discharge was not for good cause . . .; or

(c)    the employer violated the express provisions of its own written personnel policy.

MCA § 39-2-904(1).

As noted, Bresnan seeks summary judgment arguing that it had good cause to discharge Qualters. *ECF 28 at 4-12.* It also argues that it did not violate its policies and procedures when it discharged him. *Id. at 12-14.*

Qualters, on the other hand, argues that summary judgment is not appropriate. He maintains that genuine issues of material fact exist respecting both (1) whether Bresnan had good cause to discharge him, *ECF 35 at 6-13*, and (2) whether Bresnan violated its employment policy when it discharged him, *id. at 13-14.* Such fact issues, he argues, preclude summary judgment and necessitate trial. *Id. at 14-15.*

## A. <u>Good Cause</u>

The WDEA defines "good cause" as "reasonable job-related grounds for dismissal based on a failure to satisfactorily perform job duties, disruption of the employer's operation, or other legitimate business reason." MCA § 39-2-903(5). A legitimate business reason is one that is "neither false, whimsical, arbitrary or capricious, and . . . must have some logical relationship to the needs of the business." *Baumgart v. State of Montana*, 332 P.3d 225, 231 (Mont. 2014) (*quoting Sullivan v. Continental Const. of Montana, LLC*, 299 P.3d 832, 835

(Mont. 2013)).  To defeat a motion for summary judgment, the employee may either prove that the given reason for the discharge is not "good cause" in and of itself, or that the given reason "is a pretext and not the honest reason for the discharge." *Becker v. Rosebud Operating Services, Inc.*, 191 P.3d 435, 441 (Mont. 2008) (*quoting  Johnson v. Costco Wholesale*, 152 P.3d 727, 734 (Mont. 2007)).

In considering whether good cause exists for a discharge, courts strive to balance an employer's right to exercise discretion over who it will employ and keep employed with an employee's legitimate interest in maintaining secure employment.  *Buck v. Billings Montana Chevrolet, Inc.*, 811 P.2d 537, 540 (Mont. 1991).  "The balance should favor an employee who presents evidence, and not mere speculation or denial, upon which a jury could determine that the reasons given for his termination were false, arbitrary or capricious, and unrelated to the needs of the business." *Johnson v. Costco Wholesale*, 152 P.3d 727, 733 (Mont. 2007) (*quoting Kestell v. Heritage Health Care Corp.*, 858 P.2d 3, 8 (Mont. 1993)).

Bresnan argues that it had good cause to discharge Qualters "many times over." *ECF 28 at 4.*  It argues that Qualters was told he

violated company policies and was warned that he would be discharged for further violations. *Id.* When it was discovered two months later that Qualters continued to regularly violate company policies, Bresnan discharged him. *Id.*

Bresnan argues that it warned Qualters, both in the final written warning and the later audit of his calls, that it had identified performance deficiencies that include: (1) wasting time; (2) disconnecting customer calls within a few seconds of receiving them; (3) calling his own personal cell phone then transferring the calls to the customer survey in attempts to artificially inflate his survey transfer numbers by making it appear as though he transferred callers to the survey more often than he actually did; (4) calling his work voicemail box then hanging up the call immediately after connecting to put him on the bottom of the queue of agents receiving calls – a form of call avoidance; (5) failing to report his suspected malfunctioning headset to a supervisor instead of to a lead agent when he started experiencing dropped calls; (6) failing to transfer callers into Bresnan's customer service survey; (7) instructing a customer to disconnect his cable so that the customer would receive service from technicians before other

customers; (8) telling a customer whose internet was not working properly about an unrelated internet outage in Colorado and saying that there had been some up and down with the internet that day; (9) discussing with a customer how he had personally had problems with Bresnan's online chat tool; (10) going to a non-Bresnan website to help a customer with an issue not related to Bresnan's service; (11) having a lengthy discussion with a customer about the spelling of the customer's son's name, thus unnecessarily extending the length of the call; (12) failing repeatedly to conduct a call closing, to offer additional assistance, and to discuss the survey with customers; (13) cursing by using the word "damn" while on a customer call; (14) saying "that stinks" during a customer's call; (15) setting the phone down without placing the customer on hold for three and a half minutes and then disconnecting the customer; (16) transferring a customer call without first accessing the customer's account; and (17) transferring the call to the commercial billing queue when he should have handled the customer's problem himself. *ECF 28 at 4-12.*

Qualters responds that genuine issues of material fact exist respecting whether Bresnan had good cause to discharge him. And he

has presented evidence to support his position that Bresnan's proffered reasons do not comprise good cause for discharging him.

Specifically, Qualters states in his affidavit that: (1) he believes he was a competent, resourceful, and diligent employee while at Bresnan, and that he had no intent to waste time, *Qualters Affidavit (ECF 33) at ¶ 3*; (2) he started experiencing more call disconnections or "dropped calls" than usual in October 2011 and other agents also would have them at times, *id. at ¶ 5*; (3) he did not know if the dropped calls were the result of the drop, the phone system, or his headset, but he started to suspect the headset, so he reported the problem to a lead agent, *id.*; (4) after his November 2011 meeting with McNiven and Nielsen, he swapped out his headset with McNiven's headset and the problem was entirely resolved, *id.*; (5) even though Nielsen thought he was intentionally disconnecting customer calls and wasting company time by making third party calls during his shift, he never disconnected calls after discovering his headset was defective and never made third party calls while on the job, *id. at ¶ 6*; (6) he explained in the November 2011 meeting that he was calling his work phone from his cell phone and transferring it to the customer survey to allow him to later transfer

customers to the survey more easily, thus saving time on each call, *id.*;

(7) he had no intention at any time to manipulate performance metrics,

*id.*; (8) his explanation to McNiven and Nielsen, which Bresnan argues

never occurred, is reflected in Bresnan's own meeting notes, which

Bresnan provided in discovery, *id.*; (9) after the November 2011

meeting, he never made any outbound calls for any purpose and all

issues were completely resolved, *id. at ¶ 7*; (10) the November 2011

meeting contained the only warning he ever received, *id. at ¶ 8*; (11)

after McNiven found that Qualters headset was defective, Qualters

asked both McNiven and Sandra Bradford to revisit the warning he had

received since it was found that he had not intentionally dropped calls,

but nothing was done, everything was fine, and he continued to do a

good job, *id.*; (12) he always transferred customers into the survey at

the end of a call during the entire time he worked for Bresnan, *id. at ¶*

*9*; (13) the customer survey requirement would change periodically such

that at one point agents were informed that they did not need to

mention the survey to customers but were to simply transfer them to

the survey at the end of a call, *id. at ¶ 10*; (14) Nielsen's January 28,

2012 audit was never shown to Qualters nor was he given the

opportunity to listen to the calls and explain, so he has no independent recollection of the calls and he did not receive a copy of the audit until after he filed this action, *id. at ¶ 11*; (15) Nielsen's audit raises minor points such as Qualters use of the word "stinks" during a call, and his statistics during his employment were always adequate, *id. at ¶ 12*; (16) respecting the fact that he had a customer disconnect a modem to receive service faster, Qualters got the idea from a lead agent to use in rare, extreme, urgent situations, *id. at ¶ 13*; (17) he geared his language and conversation with customers to their particular needs and was always polite and friendly toward customers, *id. at ¶ 14*; (18) he did not do a call closing with a customer on January 28, 2012, because he was calling the customer back, *id. at ¶ 15*; (19) he did not put a customer on hold because it was the call center's practice for an agent to get up from his desk to go to the operation desk to get a test phone so that he could make calls from both lines, *id. at ¶ 16;* (20) he transferred a call to the commercial billing queue because Bresnan was migrating new customers from Bresnan to Optimum and a floor supervisor informed him that agents were not to handle the migrations, *id. at ¶ 17*; (21) slightly more than one month after requesting and

receiving an accommodation of some medical leave for doctor appointments, Bresnan fired Qualters, *id. at ¶¶ 18-19*; and (22) when Nielsen told him he was being discharged, Qualters asked for specifics and none were given, nor were any given beyond the November 2011 warning when the Unemployment Insurance Division investigated while determining that Qualters was eligible for unemployment insurance benefits, *id. at ¶ 22*.

In reply, Bresnan argues that Qualters' response to its summary judgment motion "is replete with red herrings and internal inconsistencies[,]" "raises irrelevant issues and sham disputes of fact to distract the Court[,]" and confirms enough of Bresnan's version of the facts "to establish good cause to terminate [Qualters'] employment several times over." *Bresnan's Reply Br. (ECF 36) at 2*. Specifically, Bresnan argues that Qualters: (1) admits that he was warned in November 2011 about his conduct, knew his job was in jeopardy, and was aware that further misconduct would result in his termination, *id. at 3*; (2) admits that 13 calls were disconnected within the first 10 seconds of the call on October 21, 2011, but maintains that the disconnections were not intentional and were due to a malfunctioning

headset and nevertheless failed to properly notify a supervisor, *id. at 4*; (3) was informed that calling his work voice mail and hanging up was improper, *id.*; (4) was told that he was making outside line calls to his personal cell phone and connecting those calls to the customer survey, *id. at 4-5*; (5) admits to advising a customer to disconnect the customer's cable to get faster customer service even though Qualters maintains he was helping the customer with an urgent problem, *id. at 5-6*; and (6) admits to other violations discovered during Bresnan's audit of his calls on January 28, 2012, but claims the audit was of limited duration and scope, revealed minor issues, and was not part of the reason for his discharge, *id. at 6-7*.

Bresnan also argues that the Court is required to accept Bresnan's evidence as true if Qualters maintains that he has no recollection of the facts underlying the evidence. *Id. at 7-8.* And, Bresnan argues, Qualters' position that mistakes identified during the audit of his calls were "minor" is not true. *Id. at 8-9.*

From a review of the record, the Court concludes that Qualters has presented evidence sufficient to raise genuine issues of material fact respecting whether Bresnan had good cause to discharge him. It is

for a jury to weigh the credibility of the testimony of Qualter, as reflected in the information contained in his sworn affidavit and other evidence of record, against Bresnan's evidence in the final written warning and elsewhere. *See Weber v. Delta Dental Ins. Co.*, 882 F.Supp.2d 1195, 1198-1200 (D. Mont. 2012). If the jury were to give sufficient weight to Qualter's evidence, it could determine that the reasons Bresnan has given for Qualters' discharge were false, whimsical, arbitrary or capricious, and unrelated to the needs of Bresnan's business. *Johnson*, 152 P.3d at 733 (*quoting Kestell*, 858 P.2d at 8); *see also Baumgart*, 332 P.3d at 231. And jurors also must determine whether, from the totality of the evidence presented, Bresnan's reasons for discharging Qualters were pretextual and not the honest reason for his discharge. Thus, summary judgment on Qualters' claim that his discharge was without good cause should be denied.

### B.   Written Personnel Policy

Bresnan argues that it did not violate its written personnel policies when it discharged Qualters. *ECF 28 at 13-14.* Thus, it argues, Qualters cannot survive its summary judgment motion respecting his claim that Bresnan violated its written personnel

policies when it discharged him.  *Id.*

Qualters responds that Bresnan gave him only one written warning during his employment.  *ECF 35 at 13-14.*  He argues that all issues in the warning had been completely resolved and that he had improved his conduct before Bresnan discharged him.  Because there was no legitimate reason for his discharge, Qualters argues, his discharge violated Bresnan's written personnel policy.  *Id.*

The provision in Bresnan's employee handbook that Qualters claims Bresnan violated provides, in relevant part, as follows:

> [1] Where a performance issue has been identified, verbal counseling, a verbal warning documented to file, or a formal written reprimand with or without suspension may be issued to make you aware of the severity of the situation and provide you with an opportunity to improve your performance or conduct. [2] Where prior steps have not solved the problem or if the problem so warrants, a performance improvement plan may be issued or developed to assist you in achieving short- and long-term results by focusing on specific areas that need improvement within a given timeframe. [3] Under some circumstances, the Company may take corrective action up to and including termination of employment without prior corrective action where, for example, there are serious infractions of Company policies or if the Company believes that additional corrective action is unlikely to resolve the problem.

*ECF 27-5 at 35.*

Respecting the first sentence of the foregoing provision, on the

current record it is undisputed that Bresnan provided Qualters with a "final written warning" identifying Qualters' performance deficiencies as perceived by Bresnan.  *See ECF 27-3 at 1-2*.  It cannot reasonably be disputed that the written warning made Qualters aware of the severity of the situation when it provided:

> Your job is in jeopardy . . . [and] [a]ny further instances [of alleged performance deficiencies] will result in termination of your employment.  Continued violations of any other company work standards, policies and/or procedures, including attendance policies, may lead to future disciplinary action up to and including termination.

*Id. at 2.*

Respecting the second and third sentences of the provision, as discussed above, genuine issues of material fact exist respecting whether Qualters' performance improved and whether perceived deficiencies were resolved.  Also, as noted, fact issues exist respecting whether any of Qualters' alleged performance deficiencies amounted to "serious infractions" of Bresnan's policies sufficient to constitute good cause for his discharge and whether the reasons Bresnan has given for Qualters' discharge were false, whimsical, arbitrary or capricious, and unrelated to Bresnan's business needs.  Conflicting inferences could be drawn from the conflicting evidence detailed above.  *See Williams v.*

*Plum Creek Timber Co., Inc.*, 264 P.3d 1090, 1097-98 (Mont. 2011)

(*citing Hager v. J.C. Billion, Inc.*, 184 P.3d 340, 343 (Mont. 2008)

(whether an employer violated its own written policies is a question of

fact for the jury)).  Such conflicts fall squarely within the province of a

jury at trial and are not appropriately resolved on summary judgment.

*Id*. at 1097 (citations omitted).

## IV. <u>CONCLUSION</u>

Based on the foregoing, IT IS RECOMMENDED that Bresnan's

summary judgment motion (*ECF 26*) be DENIED, and that the Court

set this matter for trial.

NOW, THEREFORE, IT IS ORDERED that the Clerk shall serve

a copy of the Findings and Recommendation of United States

Magistrate Judge upon the parties.  The parties are advised that

pursuant to 28 U.S.C. § 636, any objections to the findings and

recommendation must be filed with the Clerk of Court and copies

served on opposing counsel within fourteen (14) days after entry hereof,

or objection is waived.

DATED this 29th day of January, 2015.

<u>/s/ **Carolyn S. Ostby**</u>
United States Magistrate Judge